# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs January 24, 2011

## STATE OF TENNESSEE v. MICHAEL D. WILLIAMS

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2009-A-532      Steve Dozier, Judge**

_____

**No. M2011-00433-CCA-R3-CD - Filed March 13, 2012**

_____

A Davidson County jury convicted the Defendant, Michael D. Williams, of first degree murder, and the trial court sentenced him to life in the Tennessee Department of Correction. On appeal, the Defendant asserts that the evidence is insufficient to support his conviction. After a thorough review of the record and applicable law, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and JEFFREY S. BIVINS, JJ., joined.

Ron E. Munkeboe, Jr., Nashville, Tennessee, for the appellant, Michael D. Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Katrin N. Miller and Anton Jackson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
## I. Facts

A Davidson County grand jury indicted the Defendant for first degree murder for shooting and killing Shelly Hernandez. At a trial on these charges, the parties presented the following evidence: Debra Everson testified that she babysat for three of the victim's children. Through this relationship, Everson met the Defendant, who was the father of two of the victim's children. Everson recalled that, on December 2, 2008, the victim picked her up to take her to the victim's apartment in Madison, Tennessee. When they arrived at the

victim's apartment complex, the Defendant was waiting for them. The Defendant and the victim spoke in the parking lot, and then they all proceeded to a Wendy's restaurant to eat. After eating, they all returned to the apartment. When Everson saw the Defendant, who had driven separately to the restaurant, get out of his car to walk up to the apartment, she told the victim she would not get out of the car. The victim assured Everson that she needed to talk to the Defendant "[a]bout the kids' Christmas club stuff" and told her to "come on."

Everson testified that, once inside the apartment, the Defendant and victim went inside the bedroom and shut the door. Everson said that their two-year old son went back into the bedroom with them but that the five-year old and the eleven-month old remained in the living room playing. The victim came out of the bedroom and gave Everson her home telephone and instructed Everson to "call the police" if Everson heard the victim "holler." The victim returned to the bedroom with her cellular phone. At some point, Everson heard the victim yell the Defendant's name and then "holler," "somebody please help me, help me." Everson said that she ran out of the apartment with the house phone in hand and called 911. Everson told dispatch that the Defendant was "fixing to kill [the victim]." Everson recalled that she lost her balance as she went down the stairs and slipped and fell. At the time, she thought someone was trying to help her get up but, when she looked up, she realized it was the Defendant trying to drag her back into the apartment. Everson said that she and the Defendant engaged in a "struggle." The victim, wearing only a shirt, walked out of the breezeway area of the apartments and, when the Defendant saw her, he let go of Everson. The Defendant approached the victim, put his arm around her neck and placed a black gun to her head. Everson said that she began running and, when she looked back at the Defendant, she saw the Defendant pointing a gun at her. As she continued running, she heard a "pow." When she looked in the Defendant's direction again she saw the victim lying on the ground. Everson hid under a car, and the Defendant "came looking for [her]," but was unable to find her. Everson testified that she later spoke with police and identified the Defendant as the shooter.

On cross-examination, Everson conceded that she did not get a "good look" at the gun. Everson agreed that her one time "good friendship" with the Defendant had turned "sour."

Walter Koslowski, a DirecTV employee, testified that, on December 2, 2008, he was working at Highland Ridge Apartments in Madison, Tennessee. Koslowski said that as he exited a customer's residence to get more supplies from his van he heard a woman screaming, "[C]all 911." As he approached his van he saw a black man to his right, holding a white woman around the neck. Koslowski said that he locked the van door after getting the supplies out and heard a gunshot. When he turned around, he saw the man standing in front of him, holding his pants up, with a black automatic gun in his hand. The two men made eye contact, and then Koslowski looked away. When he turned back to look again, he saw the man run through the apartment breezeway. Koslowski then ran back into the DirecTV

customer's residence, locked the door and instructed the customer to call 911. Koslowski said that he went out onto the apartment balcony and looked in the area where he saw the man holding the woman by the neck, and the woman was lying on the ground in a pool of blood. Koslowski said that he was unable to identify the man in a photographic line-up police showed to him.

Kelly McAnnally testified that she lived in a ground floor apartment at Highland Ridge Apartments. McAnnally recalled that, on December 2, 2008, she was at home with a friend when she heard screaming outside her apartment. McAnnally looked out her door and saw her upstairs neighbors, approximately fifteen feet away, arguing. The black man had the white or Hispanic female, who was wearing only a shirt, in a headlock and was pulling her toward the walkway. McAnnally said she continued to watch as the man shot the woman in the back of her head. McAnnally went outside, called 911 and then checked the woman's pulse. McAnnally described the gun used as a small, black handgun. McAnnally said that she recognized her neighbors but did not know their names and was unable to identify the black man in a photographic line-up. McAnnally agreed that, at the time of these events, she had a heroin addiction and that she had used heroin on December 2, 2008. McAnnally said that she was "clean" at the time of trial and had not used illegal drugs for eighteen months. Despite her drug use on the day of the shooting, McAnnally maintained that there was no doubt in her mind as to the events of the shooting.

Stephanie Pegram testified she was friends with Kelly McAnnally and was at McAnnally's apartment on December 2, 2008. At around 1:00 p.m. Pegram heard "someone arguing from upstairs." Pegram said she looked out the window and saw the Defendant chasing the victim, who was wearing only a shirt, down the stairs. She then saw the Defendant take out a gun. Both Pegram and McAnnally went to the front door, opened it and saw the Defendant shoot the victim in the head. Pegram said that police later showed her a photographic line-up from which she positively identified the Defendant as the shooter.

On cross-examination, Pegram testified that she did not know why the police report indicated that she "stopped looking" before the Defendant shot the victim. She maintained that she and McAnnally opened the front door and then saw the Defendant shoot the victim in the head. Pegram acknowledged that she had used crack cocaine the night before these events.

The defense called Detective Roland as a rebuttal witness and confirmed that, right after the shooting, Pegram told police that she saw the Defendant hold a gun to the victim's head, Pegram looked away and then heard gunfire. Detective Roland explained that Pegram was "very upset" and did not want to speak with police out of fear for her safety.

Hattie Baugh testified that she lived in Highland Ridge Apartments. Baugh recalled that on December 2, 2008, she heard children crying outside so she looked out her door and

saw her upstairs neighbor, a Hispanic or Caucasian woman, and the neighbor's boyfriend, a black man, outside arguing. Baugh saw the man holding a gun so she shut her door and then called 911 after she heard a gunshot. Later when police showed Baugh a photographic line-up she indicated that the picture of the Defendant "looked like" the man outside her apartment but she "could not be sure." Baugh identified the Defendant in court as the man she saw holding the gun outside her apartment.

Brad Albright, the victim's brother, testified that the victim and the Defendant had dated for five or six years and had three children together. Albright said that he had a "good" relationship with the Defendant and treated him like family. Albright recalled that at around 2:30 p.m. (1:30 p.m. central standard time) on December 2, 2008, the Defendant called him from the victim's phone. The Defendant told Albright he had killed the victim. Albright, assuming the Defendant was joking, replied, "That's nothing to be playing about. . . . That ain't funny." The Defendant responded, "no, man, I had to - - I put a bullet in your sister's head. She kept having me locked up. I was tired of being locked up, man. She's going to keep me locked up all the time." Albright said he "snapped" and went "into a rage." The Defendant hung up on Albright and did not answer the phone when Albright called back repeatedly. Albright said he called 911 in Blount County, where he lived, because he was not certain what to do. He was transferred to Davidson County dispatch and was informed that police officers were on the scene.

Clarence Thompson, a Metropolitan Nashville Police Department detective, testified that on December 1, 2008, he spoke with the victim. The victim visited the Domestic Violence office, complaining that the Defendant had made contact with their children at the babysitter's house despite a valid order of protection. Detective Thompson confirmed the order of protection and assisted the victim in obtaining warrants for the violation of the order of protection. Detective Thompson said that the victim did not follow through with those warrants.

Bill Kirby, a Metropolitan Nashville Police Department officer, testified that a roll of packaging tape and a shell casing from a 9 millimeter gun were recovered from the crime scene.

Mike Roland, a Metropolitan Police Department detective, testified that he was the lead detective in the investigation of the homicide of the victim. The initial call for the shooting occurred at 1:12 p.m., and the detective arrived at Highland Ridge Apartments shortly thereafter. Based upon what the detective learned at the scene, the Defendant was developed as a suspect and located through a GPS locator on the Defendant's car. Police took the Defendant into custody, and Detective Roland conducted a video-recorded interview with the Defendant. This video recording was played for the jury, wherein the Defendant said that he agreed to meet with the victim despite a valid order of protection prohibiting him from doing so. He said that he, the victim, and the children ate lunch at Wendy's and then

returned to the apartment. He and the victim discussed reconciliation and then they began to argue over the Defendant's infidelity to the victim. The Defendant told the detective that he opened the bedroom door and saw the front door was open. He went to the front door and saw his children on the porch while Everson was outside on the phone with police saying the Defendant was going to shoot the victim. The Defendant approached Everson and told her he did not have a gun. He then saw the victim run outside unclothed. When he asked her why she was outside unclothed, she responded, "don't shoot me." The Defendant said he then heard a bang, the victim dropped to the ground, and he fled. He maintained that he did not have a gun.

Detective Roland testified that the Defendant told him that the victim initiated phone calls with him requesting he join her to Christmas shop for the children. Detective Roland obtained the victim's phone records. The records confirmed that the victim called the Defendant but also showed approximately ninety phone calls placed from the Defendant's uncles' residence, where the Defendant was staying, to the victim's phone. Detective Roland identified packing tape found around the victim's neck in a photograph taken at the scene. Detective Roland said that he asked the Defendant about the packing tape, and the Defendant said that he was "messing around" and placed some tape on the victim's arm but denied placing tape around her neck.

On cross-examination, Detective Roland agreed that the Defendant consistently denied shooting the victim and denied having a gun. Detective Roland testified that the Defendant's uncle told police he owned and kept a 9 mm gun in the house where the Defendant was staying at the time. The Defendant's uncle gave police the gun, and Detective Roland ordered testing. The results confirmed that the 9 mm shell casings recovered at the scene were not fired from the 9 mm gun recovered at the Defendant's uncle's home. The murder weapon was never recovered.

Dr. Tom Deering, a senior associate medical examiner, testified as an expert witness in the field of forensic pathology. Dr. Deering performed an autopsy on the victim on December 3, 2008. Upon initial examination, Dr. Deering found clear plastic tape loosely wrapped around the victim's neck. Dr. Deering described the entrance wound as on the left side of the forehead with the bullet exiting out the right back side of the victim's head. Dr. Deering estimated that the range of fire in this case was approximately two feet. Dr. Deering testified that the cause of death was a gunshot wound to the head, and the manner of death was homicide.

The Defendant testified that, over the course of their five-year relationship, the victim had police arrest the Defendant on five or six occasions. She would then post the Defendant's bond, and the two would reconcile. The Defendant testified that, on December 2, 2008, he called the victim, and she asked him to come see her and their children. The Defendant agreed and met her at her apartment where they decided to go eat lunch. The

Defendant rode alone in his car while the victim, Everson, and the children rode in a car together. The Defendant described the meal at Wendy's restaurant as pleasant.

The Defendant testified that, after eating, they returned to the victim's apartment. The victim asked the Defendant if he was "coming home," and the Defendant told her he was "done with the relationship." The victim then told the Defendant that she believed someone had followed her back to the apartment. When the Defendant questioned her about this concern, the victim told him that she owed someone $50,000, to which the Defendant responded, "you're a dead woman walking." The couple began to discuss other things, and the victim asked the Defendant if he wanted to have sex and he agreed. They both began to undress when the victim began asking the Defendant if he had engaged in sex with any other women. The Defendant became angry, put his shirt on and walked out of the bedroom while the victim yelled for him not to leave.

The Defendant said that when he opened the bedroom door, he saw Everson running out of the apartment on the phone saying that the Defendant had a gun. The Defendant turned to the victim and asked what Everson was talking about. The victim responded, "you don't want to f*** me." The Defendant said that he kissed his children good-bye and walked out the front door of the apartment. The victim followed the Defendant down the steps wearing only a shirt. The Defendant said a man was sitting on the steps outside, so he told the victim to return to the apartment because she was not dressed. The victim continued to "holler" and "cuss" at the Defendant. As the two were arguing, the man who had been sitting on the steps walked up to the Defendant and victim while pointing a gun and shot the victim in the head. The Defendant said that he backed away and the man turned the gun on the Defendant and then the man backed away and left. The Defendant said he rushed to the victim and checked her pulse, but she was already dead. The Defendant instructed one of the neighbors to call the police and then left because he was concerned about the order of protection and illegal drugs he had stored in the car.

The Defendant testified that, after fleeing the scene, he called the victim's brother and told him that the victim had been killed and that her family needed to "get down there." The Defendant testified that he believed the police "targeted" him because the victim had taken an aggravated assault warrant out against him the previous month. The Defendant denied ever harming the victim at any time in their relationship.

On cross-examination, the Defendant explained that the victim took warrants out for his arrest because he was attempting to terminate the relationship. When asked about the tape found around the victim's neck, the Defendant explained that the packing tape was his, but he did not know how it got around the victim's neck.

Based upon this evidence, the jury convicted the Defendant of first degree murder. The trial court ordered the Defendant to serve a life sentence in the Tennessee Department

of Correction.  It is from this judgment that the Defendant now appeals.

## II. Analysis

The Defendant argues that the evidence presented at trial is insufficient to support a finding that he is guilty of first degree murder.  He contends that inconsistency in witness testimony and a lack of physical evidence leaves the conviction unsupported.  The State responds that the proof, including multiple eyewitnesses to the shooting and the Defendant's admission to the victim's brother, supports the jury's finding that the Defendant is guilty of first degree murder.  We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)).  This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).  In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973).  The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted).  "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).  In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).  Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956).  "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859.  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)).  The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury
> see the witnesses face to face, hear their testimony and observe their demeanor
> on the stand.  Thus the trial judge and jury are the primary instrumentality of

> justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The Defendant was convicted of first degree murder and the State was required to prove beyond a reasonable doubt that the Defendant committed a "premeditated and intentional killing" of the victim. T.C.A. § 39-13-202(a)(1) (2010).

The evidence, viewed in the light most favorable to the State, proves that the Defendant and the victim had an ongoing tumultuous relationship resulting in numerous warrants for the Defendant's arrest. Upon the Defendant's release from the most recent warrant involving violence against the victim, the Defendant went to the victim's apartment. While there, the two engaged in an argument which was overheard by the babysitter, Everson. At the victim's earlier instruction, Everson called 911. Everson went outside, and as she called 911, she fell and the Defendant began pulling her back into the apartment. The victim then came running out of the apartment partially clothed and the Defendant abandoned Everson and went after the victim. Multiple witnesses saw the Defendant draw a gun, shoot the victim in the head, and then flee the scene. Thereafter, the Defendant called the victim's brother and told him that he had killed the victim in an attempt to avoid returning to jail.

We conclude that the evidence is sufficient to sustain the Defendant's conviction for first degree premeditated murder. We first note that physical evidence is not required as a basis for a jury's determination of identity. The identity of the defendant as the perpetrator of the offense is a question of fact for the jury. *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). The jury heard the Defendant's version of the December 2, 2008 events, and by their verdict rejected the Defendant's denial. The Defendant also claims that the witness testimony was "inconsistent and unreliable." It is the jury who is charged with making credibility determinations, not this Court. *State v. Smith*, 24 S.W.3d 274, 278 (Tenn. 2000). It is not the function of this court to reweigh the credibility of witnesses on appeal. *Id*. at 278-79. There was sufficient evidence to support a jury finding that the Defendant committed first degree premeditated murder. We will not disturb their decision. The Defendant is not entitled to relief as to this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE